**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Herman B. SLATER, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Harold L. PORTER, Defendant–Appellant.**

Nos. 91–3276, 91–3294.

United States Court of Appeals, Tenth Circuit.

Aug. 4, 1992.

---

Keith C. Sevedge (Carl E. Cornwell with him on the brief), Kansas City, Kan., for defendant-appellant Herman B. Slater.

David J. Phillips, Asst. Federal Public Defender (Charles D. Anderson, Federal Public Defender, with him on the brief), Kansas City, Kan., for defendant-appellant Harold L. Porter.

Before MOORE, ENGEL,* and KELLY, Circuit Judges.

PER CURIAM.

Herman B. Slater and Harold L. Porter appeal from convictions of conspiracy to possess and possession with intent to distribute approximately 223.3 grams of crack cocaine within 1,000 feet of a public elementary school. The district court imposed respective sentences of imprisonment of 235 and 168 months followed by periods of supervised release. In these related appeals, Mr. Slater and Mr. Porter raise numerous issues challenging their convictions and sentences. We affirm the convictions and Mr. Slater's sentence, however, we remand Mr. Porter's case for resentencing.

## I. Background

On May 8, 1990, Randall Listrom, a Topeka police detective, arrested Anthony Young for possession of one-quarter gram of cocaine. Faced with sentencing under the Kansas Habitual Criminals Act, Young agreed to assist the Drug Enforcement Administration and the Topeka Police Department in their investigation of Topeka area drug distribution in exchange for a favorable sentence. Accordingly, Young identified defendants as persons who supplied him with drugs and described to the agents how a typical transaction with them would occur.

He stated he would call Mr. Porter, whom he knew only as "Harold," and Harold would connect him with Mr. Slater, whom he knew as "Bryant." Mr. Young would then arrange to obtain a quantity of

Leon J. Patton, Asst. U.S. Atty. (Lee Thompson, U.S. Atty., with him on the briefs), Kansas City, Kan., for plaintiff-appellee.

* Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

drugs directly from Bryant at a location specified by Bryant.

Two days later, at the direction of DEA agents, Mr. Young telephoned Mr. Porter asking to buy eight ounces of cocaine. They arranged to meet on May 11 at a Kansas City convenience store. That call and two others were recorded.

Under a plan to create a "buy bust,"[1] Special Agent Audis Wells, working undercover, would accompany Mr. Young to meet Mr. Porter. Agent Wells would carry $9,600 in cash to help him simulate his intent to purchase. When it was certain Mr. Slater had the cocaine, surveillance DEA agents would move in and effect arrests of the suspects. (R. IV, 20). The arrests would be timed so that a completed distribution did not occur.

As planned, Agent Wells and Mr. Young drove to the specified location and spotted a car, driven by Mr. Porter, which pulled out in front of their car and led them to a nearby parking lot. Mr. Porter then parked his vehicle and got into Mr. Young's. In the car, Agent Wells handed Mr. Porter the $9,600 which Mr. Porter counted and returned. They then drove to another location where they waited until Mr. Porter made a phone call.

Mr. Porter thereafter directed that they drive to a restaurant parking lot. When they arrived, Mr. Porter showed them to a spot near a white Nissan which was parked within 1,000 feet of Coronado Middle School. Mr. Porter agreed to walk over to the Nissan and confirm his source had the cocaine. Mr. Young, too, got out and upon seeing Mr. Porter nod, gave a prearranged signal. Immediately, DEA surveillance officers wearing DEA raid jackets and with weapons drawn fanned out, one group surrounding the white Nissan, the other ordering Mr. Young and Mr. Porter to the ground where they were handcuffed and arrested.

Contrary to the plan, however, the white Nissan sped off, jumping a curb, and leading pursuing officers on a high-speed chase which ended only after officers shot out two of the vehicle's tires. His escape thus thwarted, Mr. Slater was pulled forcibly from the car and arrested.

Upon a search of Mr. Slater's car, officers found $2,400 in cash, a semiautomatic pistol, and a cellular phone. Later, officers found a paging device and paper sack containing approximately 223 grams of crack cocaine which had been seen thrown from the white Nissan during the chase. Afterward, at police headquarters, Mr. Slater told DEA agents the recovered cocaine was part of a kilogram he had picked up in Houston. He also described himself as the "brains" of the operation.

In June 1990, a two count indictment was returned charging defendants with possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and further charging Mr. Slater with assault on a DEA agent in violation of 18 U.S.C. § 111. The assault charge arose from events which occurred while Mr. Slater sped from the restaurant parking lot in an attempt to avoid arrest.

In the trial of that indictment, a jury acquitted Mr. Slater of the assault charge but was unable to reach a verdict on the remaining count. The court therefore declared a mistrial on that charge, and the government filed the present superseding indictment under which defendants were tried and found guilty.

In contrast to the first superseding indictment, the second charged defendants in Count I with violation of 21 U.S.C. § 846, conspiring to possess with intent to distribute crack cocaine. The indictment alleged the conspiracy was evidenced by: (1) the May 10, 1990 telephone conversations; (2) the various arrangements Mr. Porter and Mr. Young made to sell the cocaine base; (3) the meeting with Mr. Young, the undercover agent, and Mr. Porter; (4) Mr. Porter's examining the cash for the purchase; (5) Mr. Porter's directing the agent to the particular parking lot; and (6) Mr. Slater's

---

1. A "buy bust" involves setting up a drug sale knowing no exchange of money or drugs will occur. (R. V, 256).

possession of 223.3 grams of crack "with the intent to deliver it in exchange for the $9,600.00 which Special Agent Wells possessed." Count II charged the defendants with knowingly and intentionally possessing with intent to distribute approximately 223.3 grams of crack cocaine within 1,000 feet of a public elementary school, in violation of 21 U.S.C. § 841(a), 21 U.S.C. § 845(a), and 18 U.S.C. § 2.

The indictment specifically alleged the conspiracy to possess with intent to distribute crack cocaine took place "on or about May 11, 1990," the date of the "buy bust." In the testimony offered at trial, the government established the confidential informant, Mr. Young, called Mr. Porter on May 10 and 11 to arrange to buy eight ounces of crack, and, through Mr. Porter's connection to Mr. Slater, to ultimately purchase the drugs from Mr. Slater. The government also established that Mr. Porter had earlier traveled with Mr. Slater to Houston to secure cocaine. Both defendants maintain that this evidence is legally insufficient to convict under either count as charged.

## II. Conspiracy Convictions

■■■ A conspiracy conviction requires the government to prove " '[1] that two or more persons agreed to violate the law, [2] that the defendant knew at least the essential objectives of the conspiracy, ... [3] that the defendant knowingly and voluntarily became a part of it,' and [4] that the alleged coconspirators were interdependent." *United States v. Evans,* 970 F.2d 663, 668 (10th Cir.1992) (quoting *United States v. Fox,* 902 F.2d 1508, 1514 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990)). *See also United States v. Esparsen,* 930 F.2d 1461, 1471 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). A defendant's participation in a conspiracy is proven by evidence tending to show that the defendant shared a common purpose or design with his alleged coconspirators. *Fox,* 902 F.2d at 1514. The conduct of the alleged coconspirators, including the defendant, may be diverse and far-ranging, but it must be interdependent in some way.

*United States v. Daily,* 921 F.2d 994, 1007 (10th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991). Thus, if the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole, there is evidence of interdependence. *Id.* A defendant's connection to a conspiracy may be slight, but that slight connection must be proven with evidence to establish knowing participation beyond a reasonable doubt. *See Direct Sales v. United States,* 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943); *United States v. Savaiano,* 843 F.2d 1280, 1294 (10th Cir.1988). Casual transactions with persons involved in a conspiracy are insufficient to establish that critical connection—one who merely purchases drugs or property for personal use from a member of a conspiracy "does not thereby become a member of the conspiracy." *United States v. Fox,* 902 F.2d 1508, 1514 (10th Cir.1990). "Those having no knowledge of the conspiracy are not conspirators...." *United States v. Falcone,* 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128 (1940). Nor does one become a member of a conspiracy merely by associating with conspirators known to be involved in crime. *See id.* at 210, 61 S.Ct. at 206 (casual unexplained meetings with conspirators insufficient to establish knowledge); *Fox,* 902 F.2d at 1514. We are mindful to guard against the mass application of guilt when conspiracy charges are involved because guilt is always dependent on personal and individual conduct, not on mere association or unknowing involvement. *See Kotteakos v. United States,* 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946); *United States v. Espinosa,* 771 F.2d 1382, 1392 (10th Cir.), *cert. denied,* 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985).

■■■ We review the evidence in the light most favorable to the government to determine whether any rational trier of fact could find the defendant guilty beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). This defer-

ential standard recognizes that it is "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319, 99 S.Ct. at 2789. Credibility choices are resolved in favor of the jury's verdict, *id.* at 326, 99 S.Ct. at 2793; *United States v. Record*, 873 F.2d 1363, 1367 (10th Cir.1989), but we may not sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference. *Direct Sales*, 319 U.S. at 711, 63 S.Ct. at 1269; *Fox*, 902 F.2d at 1513.

█ With those standards in mind, we consider the defendants' arguments. Mr. Slater contends that his conspiracy conviction cannot stand because of insufficient evidence concerning possession. This contention is untenable for at least two reasons. First, we reject the factual premise of the argument in part VII, *infra;* a reasonable trier of fact could find actual possession beyond a reasonable doubt on these facts. Second, as we discuss below, a conspiracy conviction for possession with intent to distribute under § 846 does not require an overt act or evidence of possession. *United States v. Horn*, 946 F.2d 738, 745 (10th Cir.1991); *United States v. Esparsen*, 930 F.2d at 1471–72 & n. 10.

Mr. Porter makes a similar argument, but also contends that the evidence is insufficient on the conspiracy count because the government should have charged a conspiracy to *distribute*, rather than a conspiracy to possess with intent to distribute. In Mr. Porter's words:

> The agreement between Slater and Porter in [this] case was to distribute cocaine not possess cocaine with intent to distribute. While such a conspiracy necessitates that someone possess cocaine with an intent to distribute, Porter had no power to exercise dominion or control over the cocaine, and possession of the cocaine was not the object of the conspiracy.

(Appellant Porter's Brief, 30–31). Mr. Porter's argument is faulty in several respects.

█ As we stated in *Horn:*

> Possession, possession with intent to distribute, and distribution are substantive offenses which require the element of possession or distribution. Conspiracy to commit these same offenses under § 846 does not require an overt act, let alone possession or distribution.

946 F.2d at 744–45. Thus, the statement that "someone [must] possess cocaine with intent to distribute," (Appellant Porter's Brief, 31), is wrong. So too is the notion that the government must prove a conspirator have "power to exercise dominion or control over the cocaine." *Id.* Finally, on these facts, Mr. Porter's admitted agreement to assist in the distribution of crack cocaine encompassed an agreement to possess with intent to distribute. Ample proof established that this particular conspiracy contemplated possession of the drugs as a part of the plan to distribute them. Mr. Porter knew about and is responsible for the reasonably foreseeable activities of this venture, including Mr. Slater's possession with intent to distribute. *See Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947); *Pinkerton v. United States*, 328 U.S. 640, 646–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946).

As for Mr. Porter's contention that possession with intent to distribute cocaine was not an object of this conspiracy (and the dissent's suggestion that the government proved only concerted action, but not purpose, *see* Dissent at 639–40), we think that the evidence tells a different story. Mr. Porter agreed to arrange the sale of eight ounces of crack cocaine. He led Mr. Young to Mr. Slater, counted the money and approached Mr. Slater's car to confirm the presence of the cocaine. Both the recorded telephone conversations of May 10 and 11, plainly within the conspiracy alleged "on or about May 11, 1990," *see United States v. Young*, 862 F.2d 815, 818–19 (10th Cir.1988), and the resultant presence of Mr. Porter on the scene with co-

caine, are strong evidence of common knowledge and intent to distribute. Mr. Porter and Mr. Slater were acting together with the intent to possess cocaine for the purpose of selling it at a profit. Their agreement to hold and possess it for this purpose is a conspiracy and fully supported by the proof.

Both Mr. Porter and Mr. Slater admitted that the cocaine had come from Houston. In a recorded conversation, Mr. Porter stated that he and Mr. Slater had gone to Houston to get the cocaine. This, too, supports the conspiracy convictions, but even if the Houston trip was not part of our sufficiency analysis, it bears upon the Defendants' possession at the time alleged in the indictment and is evidence of former dealings between the parties which throws light on that possession and the intent to distribute. The evidence was sufficient to support the conspiracy convictions.

### III. Aiding and Abetting Conviction— Defendant Porter

■ Defendant Porter contends the evidence was insufficient to sustain his conviction under Count II for possession of cocaine with intent to distribute or aiding and abetting the commission of that offense. Conceding the evidence may show he aided and abetted in an attempt to *distribute* cocaine, Mr. Porter, relying on *United States v. Hill*, 835 F.2d 759 (10th Cir.1987), and *United States v. Jackson*, 526 F.2d 1236 (5th Cir.1976), urges that same evidence does not establish actual or constructive possession sufficient to support a conviction under either § 841 or § 2.

We disagree. Because acts committed in furtherance of the commission of a crime by another constitute "abetting," *United States v. Abreu*, 962 F.2d 1425 (10th Cir. 1992), when Mr. Porter joined the Houston trip to obtain the cocaine eventually possessed by Mr. Slater, Mr. Porter committed the section 2 offense. Mr. Porter's trip to Houston was a part of, and essential to, Mr. Slater's criminal act of possession.

Mr. Porter's reliance on *United States v. Jackson*, 526 F.2d at 1236, is not helpful. In that case, the Fifth Circuit reversed Jackson's conviction for aiding and abetting the possession of cocaine on the ground there was no evidence "he helped [the principal] obtain the cocaine, or that he exercised any control over it." *Id.* at 1238. Jackson had introduced a codefendant to a second codefendant, both of whom arranged to sell cocaine to a DEA agent. The two codefendants were arrested after weighing and testing the drug. That same evidence, the Fifth Circuit noted, could have convicted Jackson of "aiding and abetting the distribution of the cocaine because of his overall participation in the criminal venture. Although he was not present at the actual sale, he helped set up the transaction, was aware of all the circumstances, and intended that the illegal venture succeed." *Id.*

We are disinclined to *Jackson* for two reasons. First, Mr. Porter's purposeful activities in this case were closely associated with Mr. Slater's criminal venture. Second, we disagree with the basic tenet *Jackson* creates.

On the evidentiary plane, Jackson's role consisted only of his helping to set up the transaction with the intent it succeed. In contrast, here there was evidence Mr. Porter helped Mr. Slater get the cocaine in Houston and bring it to Kansas City. That trip, then, was essential to Mr. Slater's ultimate possession. Moreover, he took an active part in stimulating Mr. Slater's cocaine market.

On the point of law, we agree with *United States v. Wesson*, 889 F.2d 134 (7th Cir.1989), which bluntly rejected *Jackson*, by concluding "[y]ou may 'abet' the crime of possession with intent to distribute by procuring the customers and maintaining the market in which the possession is profitable, even though you do nothing else to help the possessor get or retain possession. Middlemen aid and abet the offense of possession with intent to distribute." *Id.* at 135. Moreover, as noted by the Seventh Circuit, "[t]o say that [the accused] cannot be convicted without proof of possession is to say that one cannot be an aider and abettor unless one commits the principal offense, which would obliterate the crime

of aiding and abetting." *Id.* (citing *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980)). We join in that view. *See also United States v. Poston*, 902 F.2d 90 (D.C.Cir.1990).

In this case, Mr. Porter assisted Mr. Slater in his undertaking. By giving purposeful support to that endeavor, Mr. Porter violated 18 U.S.C. § 2. Given this analysis, Mr. Porter's reliance on *United States v. Hill*, 835 F.2d 759 (10th Cir.1987), is also misplaced.

### IV. Sentencing—Mr. Porter

Mr. Porter contends the district court erroneously added two levels to his sentence under U.S.S.G. § 2D1.1(b)(1) [2] and refused to depart downward under U.S.S.G. § 5H1.4 [3]. As to each objection, Mr. Porter complains the district court promised to submit a written memorandum reflecting its reasoning but failed to do so.

Challenging the factual underpinning for the enhancement, Mr. Porter focuses on testimony at the hearing on sentencing offered by Agent Larry Melton, who stated he couldn't recall if "Young ever said that Porter told him that Slater carried a gun." (V. III, 10). Mr. Porter insists he never carried a gun and reasonably did not foresee that Mr. Slater would use a gun in the course of their joint activity. Arguing that Mr. Slater's possession was not within the scope of their agreement, Mr. Porter contends the court erred in enhancing his sentence. In addition, defense counsel urges Mr. Porter's reduced mental capacity, manifest by his lack of judgment and serious deficiencies with recall and concentration, must be considered in making the factual determination Mr. Porter knew Mr. Slater possessed a gun.

There is, however, other evidence, including Mr. Young's uncontradicted statement at trial that he knew "Brian to carry a gun." (R. V, 177). Mr. Young then clarified he had never seen Mr. Slater carrying a gun but was "going by what Mr. Porter had told me, that he carried a gun." (R. V, 178). In the garden-variety drug case, we could perhaps assume joint actors are aware of the tools of their trade making it not improbable that the weapon was foreseen and connected with the offense. *United States v. Goddard*, 929 F.2d 546, 548 (10th Cir.1991); *see also* U.S.S.G. § 2D1.1(b)(1), comment. (n. 3).

However, we review specific facts and circumstances taken together, not generic conclusions, to decide whether the district court properly applied the § 2D1.1(b)(1) enhancement. In this case, despite the objection of counsel, the district court enhanced Mr. Porter's sentence without any oral or written finding to support its decision. The district court did not make a generalized statement adopting the PSR or commenting on its accuracy. Instead, the court stated it would prepare a short written memorandum ruling on each of Mr. Porter's objections, (R. III, 59, 61), although it specifically addressed two objections based on Mr. Porter's role in the offense and his physical impairments. The court apparently did not prepare the written memorandum.

We have already stated in *United States v. Underwood*, 938 F.2d 1086, 1091–92 (10th Cir.1991), under 18 U.S.C. § 3553(c), the district court must make a generalized statement of its reasoning for imposing a particular sentence so that appellate review does not flounder in the "zone of speculation." *Id.* (quoting *United States v. Donaldson*, 915 F.2d 612, 616 (10th Cir.1990)). For review, we do not need a highly detailed statement, *Underwood*, 938 F.2d at 1092, but we must be able to tie the court's sentencing decisions to a factual basis in the record to be as-

**2.** U.S.S.G. § 2D1.1(b)(1) states: "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels."

**3.** U.S.S.G. § 5H1.4 states:
Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; *e.g.,* in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

**634**

sured that basis meets the proper legal standard underpinning the enhancement provision. The district court's statement accepting the PSR as corrected is insufficient. As we observed in *Underwood*, without a statement of the district court's reasoning, a reviewing court must rely wholly on "the probation officer's awareness of the proper standard for a § 2D1.1(b)(1) firearm adjustment." *Underwood*, 938 F.2d at 1092. We are unwilling to do so here. We therefore remand the case for the court to state its reasoning attributing the weapon to Mr. Porter consistent with this opinion.

Similarly, we remand with some guidance on the court's conclusion that U.S.S.G. § 5H1.4 is limited to those cases in which a defendant's physical impairment is so extraordinary that only a non-custodial sentence is appropriate. In so finding, the court agreed with the government that Mr. Porter's physical condition is not so severe that prison officials would be unable to care for him within existing facilities.

Before the court was an extensive record documenting Mr. Porter's physical and mental disabilities. In addition to borderline mental retardation and chronic major depressive disorder, Mr. Porter suffered from spondylosis and scoliosis of the spine which were untreated until he was in his twenties. Mr. Porter's examining physician, Dr. William Logan, Director of the Department of Law and Psychiatry at the Menninger Clinic, documented the connections between Mr. Porter's disabling back pain and his inability to work, severe headaches, depression, and drug use. In 1990, the Social Security Administration judged Mr. Porter totally disabled based on these physical and emotional problems and awarded benefits retroactive to 1988.

In addition, as previously noted, the district court initially found Mr. Porter incompetent to stand trial based on Dr. Logan's psychiatric evaluation. Upon the advice of defense counsel and the government's agreement, the court ordered Mr. Porter to undergo ninety days of treatment on an outpatient basis at the Wyandotte Mental Health Center. Subsequently, the court accepted the Bureau of Prisons' final forensic report documenting Mr. Porter's competence to stand trial although he still suffered from a chronic depressive disorder for which he continued taking medications prescribed during treatment.

Given this medical and psychiatric history, Mr. Porter's counsel argued at the later hearing on sentencing that these conditions comprised "an extraordinary physical impairment" meriting a sentence below the applicable guideline range or "other than imprisonment even." (R. III, 49). To support this contention, Mr. Porter relied on *United States v. Ghannam*, 899 F.2d 327 (4th Cir.1990). The government objected, believing § 5H1.4 was confined solely to non-custodial sentences in which defendant's physical impairment required hospitalization. The government relied on *United States v. Greenwood*, 928 F.2d 645 (4th Cir.1991). Rejecting the objection, the court observed, "the Court does tend to agree with the Government that this probably meant—this guideline was probably meant to imply [sic] only in those extreme cases where physical impairment was so severe that the Bureau of Prisons could not reasonably handle the care required...." (R. III, 59).

Our review is premised on the district court's belief it was without authority under § 5H1.4 to depart from the guidelines, not its failure to depart. *United States v. Belden*, 957 F.2d 671, 676 (9th Cir.1992) (citation omitted). We review de novo the district court's legal conclusion that § 5H1.4 is not available in determining Mr. Porter's sentence.

Although specific offender characteristics "are not ordinarily relevant" to the departure decision, U.S.S.G., Pt. H, intro. comment., §§ 5H1.1–5H1.6 enumerate certain factors which in extraordinary circumstances may be considered to decide "whether a sentence should be outside the applicable range and, in certain cases, to the determination of a sentence within the applicable guideline range." *Id.; United States v. Mondello*, 927 F.2d 1463, 1470 (9th Cir.1991) (citation omitted). In contrast, the government argues § 5H1.4 "is

not a *departure* guideline" and would confine § 5H1.4's "extraordinary physical impairment" language to either/or determinations: either the impairment can only be treated on a non-custodial basis; or, as a matter of law, it is not sufficiently extraordinary to be considered under this section. The government cites *Greenwood*, 928 F.2d at 645, and *United States v. Sanchez*, 933 F.2d 742 (9th Cir.1991) (drug dependence not proper basis for downward departure), to support its position.

In *Greenwood*, the Fourth Circuit affirmed the district court's decision to impose a sentence other than imprisonment because of defendant's "extraordinary medical problem" which required treatment at a Veterans Administration Hospital, and "incarceration would jeopardize this treatment." 928 F.2d at 646. Defendant had lost both legs during his service in the Korean War. In *Sanchez*, the Ninth Circuit rejected the application of § 5H1.4 on the ground defendant's drug dependence was not an extraordinary physical condition. We do not disagree with either disposition, but neither speaks to the issue as presented here. In *Greenwood*, defendant's particular physical condition gave the court no other sentencing option. In *Sanchez*, the guidelines directly address the bearing of drug dependency on sentencing decisions.

The plain language of the Policy Statement of § 5H1.4 provides: "[A]n extraordinary physical impairment *may be* a reason to impose a sentence *below the applicable guideline range; e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." (emphasis added). While the example proffered illustrates the Policy Statement, it does not present the exclusive means of carrying it out. To so hold ignores the words "below the applicable guideline range."

■ This reading finds support in *United States v. Ghannam*, 899 F.2d at 329, in which the Fourth Circuit affirmed the district court's rejection of defendant's similar argument that § 5H1.4 was intended to eliminate rather than reduce his sentence.

The Fourth Circuit stated, "Section 5H1.4 does not, however, contemplate that a defendant's physical condition is relevant only to the decision whether to impose imprisonment. Section 5H1.4 allows downward departures any time a sentencing court is presented with sufficient evidence of impairment." *Id.* at 329. The court reasoned the greater departure, no imprisonment, necessarily included the lesser departure, shorter imprisonment. *Id.* The First Circuit had the same interpretation of § 5H1.4, citing *Ghannam*. "[A] sentencing court is not faced with an all-or-nothing choice between the GSR-range [Guideline Sentencing Range] imprisonment or no imprisonment, but may lawfully decide to impose a reduced prison sentence below the GSR." *United States v. Hilton*, 946 F.2d 955, 958 (1st Cir.1991). Of course, the extent of departure must be reasonable in light of the circumstances of the particular case. *Id.*

We agree with the analysis of the First and Fourth Circuits. The district court erred in failing to apply § 5H1.4 to decide whether Mr. Porter's showing of physical impairment met the guideline definition and, if so, to what extent a downward departure or alternative sentence was warranted. We therefore remand this case for the court to make the appropriate findings under § 5H1.4.

To do so, the district court should first make a factual finding to decide whether Mr. Porter's physical and mental disabilities constitute "an extraordinary physical impairment." *United States v. Carey*, 895 F.2d 318, 324 (7th Cir.1990). If the court so finds, it should then consider whether that condition warrants a shorter term of imprisonment or an alternative to confinement. *Id.* The court should set forth its reasoning in support of its decision. Thus, we remand for resentencing on this issue.

## V.  Flight Instruction—Defendant Slater

■ Mr. Slater contends the court's instructing the jury on his flight violates the

prohibition against double jeopardy.[4] In the first trial, he reminds, the jury acquitted him of assault on a DEA agent on facts arising out of the identical activity which the instruction permitted the jury to consider in judging his guilt in this trial. Because the former acquittal was based on a general verdict, Mr. Slater urges the doctrine of collateral estoppel requires our examination of the prior record to assure the evidence was not constitutionally foreclosed. Moreover, Mr. Slater contends the flight instruction, in fact, transformed those events into evidence of his guilt.

Mr. Slater's contention is misdirected. The issue decided by the first jury's general verdict was that Mr. Slater did not assault a DEA special agent. Even though the circumstances in which the charge arose were the predicate for the instruction in this case, the assault charge and the instruction are otherwise unrelated. Indeed, resolution of the assault charge implicates none of the inferences the instruction permitted the jury to draw in this trial. More importantly, this trial was not a successive prosecution of that conduct which was the basis of the first charge, *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), nor did Instruction 25 require a resolution of that conduct.

Instead, the instruction was properly grounded on the factual predicate of Mr. Slater's behavior when DEA agents attempted to stop and arrest him. The instruction guided the jurors in their evaluation of the possible inferences that arose from those events particularly because that evidence was so fervidly contested. It correctly articulated the law of this circuit, *Kreuter v. United States*, 376 F.2d 654, 657 n. 2 (10th Cir.1967), *cert. denied*, 390

U.S. 1015, 88 S.Ct. 1267, 20 L.Ed.2d 165 (1968), and was appropriately particularized to fit the facts of the case. Consequently, the district court did not err in so instructing the jury.

## VI. Motion to Suppress— Defendant Slater

After a hearing to address Mr. Slater's motion to suppress statements made when he was arrested, the district court held the statements were freely and voluntarily made based on its finding the arresting officer properly advised him of his rights at least twice, and Mr. Slater agreed to talk to officers without an attorney present. Mr. Slater now contends these post-arrest incriminating statements were the product of coercion and physical violence and urges we find them *per se* inadmissible under *United States v. Jenkins*, 938 F.2d 934, 938–39 (9th Cir.1991). The government asserts such an analysis is inappropriate under both the facts of this case and the law. Neither party addresses *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (in the absence of allegations of physical violence on behalf of the police, admission of an involuntary confession is subject to harmless error analysis).

The record of the hearing on Mr. Slater's motion to suppress focuses predominantly on whether he was, in fact, given an appropriate *Miranda* warning and on officers' perceptions of Mr. Slater's willingness to talk in the hope of his making a deal. The testimony surely paints the chase preceding his arrest as a confrontation charged with adrenaline, capped by arresting officers physically pulling the defendant through his car window. Although Mr.

---

**4.** Instruction No. 25 stated:

There has been evidence that the defendant Slater fled in his automobile from the area of Hardee's parking lot on the date in question. The government contends that Slater fled when law enforcement officers attempted to stop and arrest him. Slater contends that he did not know that these persons were law enforcement officers at the time.

You are instructed that the intentional flight of a defendant, from persons he knows were law enforcement officers, immediately

after the commission or attempted commission of a crime is not sufficient in itself to establish the defendant's guilt; but it is a fact which, if proved, may be considered by the jury in the light of all other evidence in the case in determining the guilt or innocence of that defendant. Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to any such evidence, are matters exclusively within the province of the jury.

Slater testified to being beaten by at least six or eight officers, defense counsel never questioned government witnesses about the use of force. Instead, each officer testified only that Mr. Slater was eager to make a deal, hoping to exchange the information about his Houston contacts for more favorable treatment.

■ While the factual underpinning of the district court's ruling on the motion to suppress is subject to review for clear error, *United States v. Chalan,* 812 F.2d 1302, 1307–08 (10th Cir.1987), we review de novo the ultimate issue of whether defendant's statements were voluntarily made. *United States v. Short,* 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). Because the government met its burden of proving by a preponderance of the evidence that the statements were voluntary, *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618 (1972), we view the evidence presented at the hearing in the light most favorable to the government. *United States v. Falcon,* 766 F.2d 1469, 1476 (10th Cir.1985).

■ Despite the highly charged circumstances of the arrest, we cannot say the district court erred in concluding Mr. Slater freely offered information to arresting officers. This conclusion is guided by a variety of other factors such as defendant's intelligence and education, the length of the detention, the prolonged nature of the questioning, the recitation of *Miranda* rights, and whether actual physical abuse occurred. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

We note Mr. Slater attended Kansas State University for three years where he played varsity basketball. He was questioned briefly after his arrest and later at length at the Kansas City Police Department where, as a sign of good faith in dealing with the government, he consented to the search of his residence. Although certain officers hit or kicked the defendant once he was apprehended, that physical abuse, given the totality of other circumstances, did not overcome his will. The facts of this case are therefore readily discernible from those in *United States v. Jenkins,* 938 F.2d 934 (9th Cir.1991), upon which Mr. Slater relies in urging us to adopt a *per se* rule. Viewing the evidence in the light most favorable to the government, the court balanced the evidence, weighed it, and properly held the statements do not offend the Fifth Amendment and were admissible at trial. In addition, the court instructed the jury, in part, in Instruction No. 26, "If the evidence in the case does not convince you beyond a reasonable doubt that an admission or incriminating statement was made voluntarily and intentionally, the jury should disregard it entirely."

## VII. Cocaine Possession— Defendant Slater

■ Although the government asks that we ignore Mr. Slater's possession arguments based on the concurrent sentences doctrine, we are not so restricted. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Mr. Slater maintains that, despite the involvement of at least seven DEA agents and police officers, no officer found cocaine on him and only one saw the paper sack thrown from his car. Linking that sack of cocaine to him was the government's "entire case on the element of possession," Mr. Slater contends, and was insufficient to overcome the independent evidence of at least two other witnesses' seeing the sack thrown from a different car.

Contrary to this characterization, other evidence, direct and circumstantial, viewed in the government's favor, was sufficient to support the jury's conclusion Mr. Slater possessed cocaine. The search of his vehicle produced a large amount of cash, a semiautomatic pistol, and a cellular phone, each of which is a recognized tool of the trade in drug dealing. *See, e.g., United States v. Martinez,* 938 F.2d 1078 (10th Cir.1991). These items, added to the discovery of the sack of crack cocaine and pager, provide ample evidence of Mr. Slater's possession with intent to distribute. Although the jury heard testimony from

defense witnesses explaining the presence of the large amount of cash and describing how the brown paper sack was thrown from another tan vehicle, the jury resolved this conflicting testimony and judged the credibility of these witnesses. We shall not disturb its resolution.

## VIII.  Defendant Slater's Base Offense Level

■ Although Mr. Slater was charged with possession with intent to distribute 223.3 grams of crack cocaine, included in the calculation of his base offense level under U.S.S.G. § 1B1.3(a)(1) was 524.4 grams of crack cocaine, a figure arrived at by multiplying the number of prior transactions by the amount of crack involved. According to Mr. Young, these sales occurred during a three-month period before the charged offense and reflected a similar pattern of dealing. After a hearing on defendant Slater's objections to the Presentence Report, the district court found a preponderance of evidence supported the PSR's computation of the offense level and accepted it, noting "[i]n fact, it's on the conservative side." (Appellant Slater's Appendix, 303).

Under the Drug Quantity Table in U.S.S.G. § 2D1.1, the additional cocaine raised the base offense level from 34 to 36. Mr. Slater contends as a matter of due process we should remand for resentencing because Mr. Young's testimony was unreliable and provided the district court with only imprecise estimates.

The guidelines provide otherwise, however, and require the district court to include quantities of drugs "not specified in the count of conviction ... in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." U.S.S.G. § 1B1.3, *Commentary—Background*. We review the calculation of those quantities for clear error, *United States v. Havens*, 910 F.2d 703, 704 (10th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991), and the application of U.S.S.G. § 1B1.3(a)(1), that the quantities constitute relevant conduct, for an error of law.

Mr. Young testified at trial that he had dealt with Harold and Bryant fifteen or twenty times before and connected those dealings to the convicted offense without contest from defense counsel. This testimony added to the information in the PSR satisfies the prosecutor's duty to prove the additional quantities by a preponderance of the evidence. *United States v. Ross*, 920 F.2d 1530, 1538 (10th Cir.1990); *United States v. Boyd*, 901 F.2d 842, 845 (10th Cir.1990). On this basis, we cannot say the district court's finding was clearly erroneous.

## IX.  Disproportionality

■ Finally, Mr. Slater, joined by Mr. Porter, contends that the imposition of a sentence based on equating the possession of "cocaine base" to the possession of one hundred times the same quantity of cocaine is prohibited by the Constitution's void-for-vagueness doctrine because "cocaine base" and "cocaine" are unconstitutionally vague terms. Although Mr. Slater acknowledges our decision in *United States v. Turner*, 928 F.2d 956, 960 (10th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991), he distinguishes that case on the ground Turner did not challenge the substance he possessed was inaccurately classified as cocaine base. 928 F.2d at 960, n. 1. Here, however, the forensic chemist testified the cocaine base she tested was only 34% pure. Mr. Slater, therefore, requests remand for resentencing using cocaine and not cocaine base to set his base offense level.

Contrary to defendant Slater's characterization, the record contains no factual challenge to the substance involved to distinguish this case from *Turner*. In his Objection No. 10, Mr. Slater, while contesting the number of transactions used to calculate quantity, did not contest the substance itself. (Appellant Slater's Appendix, 276). Defense counsel cross-examined the government's forensic chemist on the question of whether there were any identifying marks or fingerprints on the cocaine bags

she analyzed. (R. VII, 298). In sentencing Mr. Slater, the court found by a preponderance of the evidence all transactions involved crack cocaine and specifically overruled Mr. Slater's objection to the quantity of cocaine base used in the PSR. (Appellant Slater's Appendix, 303). We reject defendant Slater's challenge to the disproportionate sentencing contained in U.S.S.G. § 2D1.1(a)(3) based on our previous analysis in *Turner.*

We therefore AFFIRM defendants' convictions and Mr. Slater's sentence, but REMAND for resentencing of Mr. Porter in accordance with this opinion.

John P. MOORE, Circuit Judge, dissenting.

I must respectfully dissent from the court's analysis and conclusions relating to the defendants' conspiracy conviction. For me, this case presents a unique situation which is not subject to the modality of ordinary conspiracy review. Two fundamental points move me to this conclusion.

First, the government charged the conspiracy existed only on one day, May 11, 1990. Because this limitation on the scope of the conspiracy seemed peculiar, I asked government counsel at oral argument whether the government relied upon any fact that occurred other than on that date to establish the conspiracy. The response was in the negative. Thus, the government's evidence in support of the charge of conspiracy is very circumscribed.

Second, the charge was that the defendants conspired to possess crack cocaine for the purpose of distribution. By its nature, the indictment alleged an agreement to control of the illegal substance on a given day, *by possession.* That is not the same as agreeing to distribute, or agreeing to attempt to sell, or actually possessing cocaine. Rather, the charge implicates an *agreement* to jointly control cocaine for the purpose of distribution.

The court correctly holds it is not ordinarily necessary to prove actual possession to satisfy the elements of proof of the crime of conspiracy to possess. I believe, however, that broad-brush conclusion ignores the peculiar facts of this case which make the general principle inapposite.

I start my analysis from the premise that the essence of conspiracy is the agreement. *United States v. Esparsen,* 930 F.2d 1461, 1471 (10th Cir.1991), *cert. denied* — U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992) ("The core of a conspiracy is an agreement to commit an unlawful act."). The agreement must have a purpose, however, *United States v. Harrison,* 942 F.2d 751, 755 (10th Cir.1991), and the charged purpose in this case was to possess cocaine. Because there was no direct evidence of this agreement, the government was burdened with having to prove its case by circumstantial evidence. While this burden is far from unusual, the circumstances and what the government actually proved lead me to conclude there is no evidence that Mr. Porter agreed to *possess* cocaine as charged in the indictment.

It is fundamental that an agreement to possess must be mutual. In this case, no distinction was drawn in the charge between the culpability of the defendants or the amount of control each allegedly agreed to exercise over the substance. Hence, the charge implied both mutually agreed to possess the cocaine.

Yet, that charge is not unusual. What *is* distinctive is that portion of the charge which limits the conspiracy to *one day.* Therefore, we are limited to the circumstances proven by the government to have occurred on *that day* to determine whether there is evidence that Mr. Porter agreed with Mr. Slater to possess, or jointly control, cocaine. When I make that search, I find no such evidence.

The court takes the position that so long as Mr. Porter knew about and was responsible for Mr. Slater's reasonably foreseeable activities, he is guilty of conspiring to possess with intent to distribute. Respectfully, I believe that generality ignores the charge contained in the indictment and the mutuality of purpose it necessarily incorporates. If the logic of the court's analysis were to prevail, the government could simply charge two people with agreeing to act

**640**

together and whatever crime either of them subsequently committed could serve as a basis for charging the other with conspiracy to commit that act.

Ignored by the court is the end point that the government's case must show the defendants agreed to possess cocaine. That requires some showing of *accord* on Mr. Porter's part. Proof of agreement does not require proof that he actually possessed cocaine, but that he merely agreed to possess it.[1] My review of the record reveals no such evidence.

Although the court points to evidence which it believes establishes the agreement to possess, I disagree. I do not believe that evidence proves an agreement to possess by Mr. Porter. At most, that evidence proves the defendants were acting in concert, but such action is only one half of the conspiracy equation. Lacking is the evidence of purpose. Indeed, Mr. Porter even suggests the evidence may show a conspiracy to distribute cocaine, but, he counters, that is not what was charged. I agree with his suggestion.

Because the government did not prove the defendants agreed to possess cocaine, I would reverse Mr. Porter's conviction on that charge. Because Mr. Slater could not conspire with himself, my analysis would require his acquittal as well.

---

**1.** Indeed, if the object of the conspiracy is frustrated, the crime of conspiracy is still complete when the parties agree to achieve the objective.